# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

SARA M. GIACHETTI,

        Appellant,

        v.

DEPARTMENT OF VETERANS
  AFFAIRS,

        Agency.

DOCKET NUMBER
DC-1221-19-0101-W-3

DATE: August 18, 2023

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Dominick D. Schumacher, Esquire, and Kristin D. Alden, Esquire, Washington, D.C., for the appellant.

Christine Beam, Esquire, and Jillian Barry, Esquire, Pittsburgh, Pennsylvania, for the agency.

Stephen Butera, Esquire, Clarksburg, West Virginia, for the agency.

**BEFORE**

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member

**FINAL ORDER**

¶1  The appellant has filed a petition for review of the initial decision, which found that she failed to establish a prima facie case of whistleblower reprisal in

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

her individual right of action (IRA) appeal. For the reasons discussed below, we GRANT the appellant's petition for review and REVERSE the initial decision to find that the appellant made a prima facie case of whistleblower reprisal and also find that the agency failed to prove by clear and convincing evidence that it would have taken one of the personnel actions in the absence of the appellant's protected disclosure. The appellant is granted corrective action.

## BACKGROUND

¶2      The appellant is currently employed as the Director of Logistics, GS-15, at the agency's Office of Acquisition, Logistics, and Construction (OALC) in Washington, D.C. *Giachetti v. Department of Veterans Affairs*, MSPB Docket No. DC-1221-19-0101-W-1, Initial Appeal File (IAF), Tab 1 at 1. At the time relevant to this appeal, the appellant served as the Director of Acquisition Business Service (ABS). *Giachetti v. Department of Veterans Affairs*, MSPB Docket No. DC-1221-19-0101-W-3, Appeal File (W-3 AF), Tab 1 at 10. In that position, the appellant's first-level supervisor was the Executive Director of the Office of Acquisition Operations (OAO), and her second-level supervisor was the Acting Chief Acquisition Officer. IAF, Tab 5 at 6; W-3 AF, Tab 16 at 4, 10.

¶3      On January 26, 2018, the appellant filed a complaint with the Office of Special Counsel (OSC) asserting that, in reprisal for making four disclosures concerning the Executive Director, as detailed below, the agency took a series of personnel actions against her. IAF, Tab 1 at 14-49. On August 30, 2018, OSC closed its file in the matter and informed the appellant of her right to seek corrective action from the Board. *Id.* at 50.

¶4      Thereafter, the appellant filed the instant IRA appeal wherein she asserted the same arguments made before OSC. IAF, Tab 1 at 6-49. Specifically, in her IRA appeal, she alleged:  (1) in or about April 2015, she disclosed to the Executive Director and later to the Acting Chief Acquisition Officer that the Executive Director violated the Anti-Deficiency Act, other fiscal and acquisition

laws, and the Federal Acquisition Regulations (FAR) when she approved the ratification of unauthorized commitments (UCs);[2] (2) in 2015, she disclosed to the Executive Director and the Acting Chief Acquisition Officer that the agency issued orders in excess of $25 million without "policy or legal review" in violation of FAR 1.602-2(c); (3) on July 1, 2015, she disclosed to the Acting Chief Acquisition Officer that the Executive Director and the Director of the Strategic Acquisition Center (SAC) provided false information in a response to a Congressional inquiry; and (4) on September 8, 2015, she disclosed to the Executive Director an "unlawful approval of an improper acquisition." IAF, Tab 1 at 7, Tab 20 at 1-2; W-3 AF, Tab 10 at 34-69. She further alleged that, in reprisal for making these disclosures, the agency took a series of personnel actions against her, including denying her a promotion in 2015, not selecting her for two other positions for which she applied in 2016, giving her unjustifiably low evaluations in 2015 and 2016, denying a grievance of her 2015 performance evaluation, denying her an opportunity to complete the Senior Executive Service Candidate Development Program (SESCDP), and subjecting her to a hostile work environment. IAF, Tab 1 at 8-11, Tab 20 at 3-4.

¶5       After finding that the Board has jurisdiction over the appellant's claims, IAF, Tab 20, the administrative judge issued an initial decision on the written record,[3] W-3 AF, Tab 21, Initial Decision (ID). He found that the appellant failed to prove by preponderant evidence that any of her four disclosures were protected under 5 U.S.C. § 2302(b)(8) either because they concerned policy disputes or because the appellant failed to prove that she had a reasonable belief that her

---

[2] According to the appellant, an "unauthorized commitment" is an agreement for the provision of goods or services that is not binding solely because the Government representative who made it lacked the authority to enter into that agreement on behalf of the Government. W-1 AF, Tab 1 at 15.

[3] Although the appellant initially requested a hearing, W-1 AF, Tab 1 at 12, she later withdrew that request, *Giachetti v. Department of Veterans Affairs*, MSPB Docket No. DC-1221-19-0101-W-2 Appeal File, Tab 5.

disclosures evidenced any of the sort of wrongdoing contemplated by section 2302(b)(8)(A).  ID at 8-23.  He further concluded that the appellant failed to prove that she made protected disclosures that were a contributing factor to any personnel action and thus denied her request for corrective action.  ID at 23.

¶6        The appellant then filed a petition for review.  Petition for Review (PFR) File, Tab 5.  Therein, she argues that the administrative judge inappropriately gave her statements less weight than those of agency officials because he erroneously believed that she did not submit a sworn declaration.  *Id*. at 25.  She also argues that he erred in concluding that disclosures one, two and three were not protected under 5 U.S.C. § 2302(b)(8).[4]  *Id*. at 24-31.  The appellant also reasserts that the agency took the above-outlined personnel actions against her and that the disclosures were a contributing factor to those personnel actions.  *Id*. at 31-32.  The agency has filed a response to the appellant's petition for review, to which the appellant has replied.  PFR File, Tabs 7-8.

## DISCUSSION OF ARGUMENTS ON REVIEW

¶7        In an IRA appeal, the appellant bears the burden of establishing a prima facie case of whistleblower retaliation.  *Lu v. Department of Homeland Security*, 122 M.S.P.R. 335, ¶ 7 (2015).  To meet that burden, an appellant must prove, by preponderant evidence, that she made a protected disclosure under 5 U.S.C. § 2302(b)(8) and that the disclosure was a contributing factor in a personnel action taken against her.  5 U.S.C. § 1221(e)(1); *Lu*, 122 M.S.P.R. 335, ¶ 7.  If an appellant does so, the agency is then given an opportunity to prove, by clear and convincing evidence, that it would have taken the same personnel action in the absence of the protected disclosure.  5 U.S.C. § 1221(e)(1)-(2); *Lu*, 122 M.S.P.R. 335, ¶ 7.

---

[4] The appellant concedes on review that her fourth disclosure involved a policy dispute, and therefore, does not challenge the administrative judge's conclusion that she failed to prove that the disclosure was protected under 5 U.S.C. § 2302(b)(8).  PFR File, Tab 5 at 25 n.8.  Accordingly, we will not consider that fourth disclosure here.

¶8		As explained below, we agree with the administrative judge that the appellant failed to prove that disclosures 2 and 3 were protected under 5 U.S.C. § 2302(b)(8). ID at 14-18. However, we find that the appellant proved by preponderant evidence that she made a protected disclosure under 5 U.S.C. § 2302(b)(8) when she made her first disclosure regarding the ratification of the UCs. Because the record was fully developed below, we have also considered whether the appellant proved by preponderant evidence that her protected disclosure was a contributing factor to the alleged personnel actions. *See, e.g.*, *Forte v. Department of the Navy*, 123 M.S.P.R. 124, ¶ 27 (2016) (finding that the Board may decide an issue on review, rather than remanding, when the administrative judge applied an incorrect standard but the record was fully developed). We also find that the appellant has shown by preponderant evidence that her protected disclosure was a contributing factor to her 2015 and 2016 performance appraisals and to the significant change in her duties, responsibilities, and working conditions.

The appellant proved by preponderant evidence that she made a protected disclosure under 5 U.S.C. § 2302(b)(8).

¶9		A protected disclosure is a disclosure that an appellant reasonably believes evidences a violation of any law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. 5 U.S.C. § 2302(b)(8)(A); *Chavez v. Department of Veterans Affairs*, 120 M.S.P.R. 285, ¶ 18 (2013). A reasonable belief exists if a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the appellant could reasonably conclude that the actions of the Government evidence one of the categories of wrongdoing listed in section 2302(b)(8)(A). *Chavez*, 120 M.S.P.R. 285, ¶ 18. The appellant need not prove that the matter disclosed actually established one of the types of wrongdoing listed under section 2302(b)(8)(A); rather, she must only show that

the matter disclosed was one which a reasonable person in her position would believe evidenced any of the situations specified in section 2302(b)(8)(A).  *Id.*

> *Disclosure 1:  The appellant proved by preponderant evidence that her disclosure regarding the unlawful ratification of the UCs is protected under 5 U.S.C. § 2302(b)(8)(A).*

¶10      The appellant asserted that, in or around April 2015, she disclosed to the Executive Director and later to the Acting Chief Acquisition Officer that the Executive Director violated the Anti-Deficiency Act, other fiscal and acquisition laws, and the FAR when she approved the ratification of prior UCs.  W-3 AF, Tab 10 at 7, 37.

¶11      In her final brief and submission to OSC, the appellant explained that the agency's Office of Inspector General (OIG) conducted an administrative investigation into the agency's expenditures related to its July and August 2011 conferences.  *Id*. at 8, 37.  The OIG found numerous excessive and unnecessary costs and determined that several of these acquisitions were made by personnel lacking authority to obligate the Government to pay them, otherwise known as UCs.  W-3 AF, Tab 11.  Regarding a certain category of UCs, the OIG recommended that "the VA Secretary take action to ratify any legal agreements made by VA employees where there was no previous authority to commit payments."  *Id*. at 67.  OALC responded to the recommendation by stating that the FAR provides clear guidance for the processing of ratifications; however, whether the expenditures in question are ratifiable is subject to the determination by the appropriate Head of Contracting Activity (HCA), subject to advice from a contracting officer and legal review.  W-3 AF, Tab 13 at 21.

¶12      On January 29, 2013, the then-HCA reported to the OIG that review of the UCs revealed that they did not meet legal requirements for ratification "due to noncompliance with [the] FAR," and that the individuals responsible for the UCs would be held pecuniarily liable.  W-3 AF, Tab 10 at 9, Tab 13 at 21.  According to the appellant, sometime later, agency officials again submitted the UCs for

ratification and a new HCA again determined that the UCs were not ratifiable. W-3 AF, Tab 10 at 9. After the second HCA departed from the position, the agency again submitted the same requests for ratification a third time, which fell to the then-HCA, who is the current Executive Director in the instant appeal. *Id*. In her role as the HCA at the time, sometime in May of 2014, the current Executive Director also determined that the UCs were not ratifiable. *Id*.; W-3 AF, Tab 14 at 8-11. According to the appellant, shortly after this third determination was made, the Executive Director sent the UCs to the SAC Director, who ratified the UCs, and the Executive Director approved the ratification on May 6, 2014, despite her earlier assertion that such ratification was against the FAR. W-3 AF, Tab 10 at 10. The appellant asserted that, once she learned of the ratification, she met with the Executive Director in April of 2015 to express her concerns over the legality of the ratifications and expressed similar concerns to the Acting Chief Acquisition Officer in July of 2015. *Id*. at 7, 12.

¶13       In the initial decision, the administrative judge stated that the appellant failed to submit a sworn affidavit and that the "only source for her version of events is the material she presented to OSC." ID at 9. Conversely, he relied substantially on sworn affidavits from the Executive Director and the Acting Chief Acquisition Officer and concluded that the appellant's disclosure "points to her disagreement with the agency's choice of remedy to correct problems identified years earlier in the IG report," and that here, "persons senior to the appellant held a different view about how to proceed." ID at 13-14. He also stated that a protected disclosure must be "specific and detailed, [and] not vague allegations of wrongdoing regarding broad or imprecise matters," and concluded that the appellant's disclosure "lacked specificity" because it was not clear which of the ratifications from the OIG she claimed were illegal. ID at 13 (quoting *Rzucidlo v. Department of the Army*, 101 M.S.P.R. 616, ¶ 13 (2006)). As such, he found that the appellant failed to prove by preponderant evidence that this disclosure was protected under section 2302(b)(8)(A). ID at 13-14.

¶14    On review, the appellant argues that the administrative judge erred in stating that she failed to submit a sworn statement, and therefore, asserts that he did not give her version of events proper weight. PFR File, Tab 5 at 25. She also claims that, had he given her statements proper weight, they would have provided the detail and specificity sufficient for the disclosure to be regarded as protected. *Id*. at 25-27. Additionally, she again asserts that she reasonably believed that her disclosure evidenced a violation of law, rule, or regulation, and therefore, that it is protected under section 2302(b)(8). *Id*.

¶15    We agree with the appellant. The appellant clearly indicated in her final brief that the statements made in her pleading and the accompanying narrative submitted to OSC were made under the penalty of perjury and are true and correct to the best of her personal information, knowledge, and belief. W-3 AF, Tab 10 at 32. Such a statement carries evidentiary weight and, when credible, can be sufficient to establish the facts asserted therein. *See Donato v. Department of Defense*, 34 M.S.P.R. 385, 389 (1987) (stating that an unsworn statement made under penalty of perjury is the equivalent to an affidavit under 28 U.S.C. § 1746 and finding that an administrative judge erred in assigning less probative value to such a statement); *see generally Willingham v. Department of the Navy*, 118 M.S.P.R. 21, ¶ 7 (2012) (explaining that a statement made under penalty of perjury, if not inherently incredible and not disputed or rebutted by the other party, proves the facts it asserts), *appeal dismissed per curiam*, 526 F. App'x 975 (Fed. Cir. 2013). Moreover, both the Executive Director and the Acting Chief Acquisition Officer admitted that they recalled speaking with the appellant regarding her concern over the UCs. W-3 AF, Tab 16 at 4-5, 11.

¶16    Regarding the substance of the disclosure, the appellant alleged, with record support and without agency dispute, that at least three other individuals expressed concern over the legality of the ratifications of the UCs. W-3 AF, Tab 10 at 9, Tab 13 at 21, Tab 14 at 5-6, 8-11. This shared belief, combined with the appellant's 29 years of experience in the acquisition field, leads us to find that

she has demonstrated that her belief that the ratification of the UCs violated law, rule, or regulation was a reasonable one. W-3 AF, Tab 10 at 38; *see Schlosser v. Department of the Interior*, 75 M.S.P.R. 15, 21 (1997) (concluding that an appellant can establish a reasonable belief that he made a protected disclosure by showing that he was familiar with the alleged illegal conduct and was therefore in a position to form such belief, and that his belief was shared by other similarly situated employees). Accordingly, we find that the appellant proved by preponderant evidence that this disclosure is protected under 5 U.S.C. § 2302(b)(8)(A). *See Reid v. Merit Systems Protection Board*, 508 F.3d 674, 676, 678 (Fed. Cir. 2007) (concluding that a disclosure of a potential violation of the FAR can constitute a protected disclosure).

> *Disclosure 2: The administrative judge correctly found that the appellant failed to prove by preponderant evidence that her disclosure regarding the agency's issuance of orders in excess of $25 million without policy or legal review in violation of the FAR was protected under 5 U.S.C. § 2302(b)(8)(A).*

¶17    In the appellant's second alleged protected disclosure, she claimed that, in June of 2015, she disclosed to the Executive Director that the agency issued orders, by way of an invalid type of contract, in excess of $25 million without policy or legal review in violation of the FAR. W-3 AF, Tab 10 at 13-14. Specifically, she asserted that the Executive Director asked her for potential approaches to acquiring medical/surgical supplies and sent the appellant a memorandum "requesting a single-award indefinite-delivery, indefinite-quantity requirements type contract" for such an acquisition. *Id*. at 13. The appellant asserted that there "is no such contract type." *Id*. She further asserted that, based on that invalid type of contract, the Executive Director authorized the issuance of orders exceeding $25 million without policy or legal review, which she claimed was in violation of FAR 1.602-2(c). *Id*. at 14. FAR 1.602-2(c) provides that contracting officers "shall [r]equest and consider the advice of specialists in audit, law, engineering, information security, transportation, and other fields, as

appropriate." 48 C.F.R. § 1.602-2(c). The appellant asserted that "no reasonable person with a modicum of knowledge about [F]ederal contract law would consider it appropriate to waive audit and/or legal review of acquisitions exceeding $25 million." W-3 AF, Tab 10 at 14.

¶18    In the initial decision, the administrative judge appears to have only addressed the portion of the appellant's disclosure that dealt with the type of contract the Executive Director asked the appellant to draft. ID at 17-18. He disagreed with the appellant's assertion that the type of contract was not a valid contract type because the FAR permits both single award and multiple-award indefinite-delivery indefinite-quantity (IDIQ) contracts. ID at 18 (referencing FAR part 16). The administrative judge found that the appellant's contention to the contrary "undermines [his] ability to find that a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee could reasonably conclude that she identified [G]overnment actions that violate 5 U.S.C. § 2302(b)(8)(A)." *Id*. As such, the administrative judge found that the appellant failed to present preponderant evidence that she had a reasonable belief in her disclosure that the IDIQ contract was not an authorized type of contract or that it lacked proper review. *Id*.

¶19    On review, the appellant claims that the administrative judge "fundamentally misunderstood" the contract the Executive Director asked the appellant to create by failing "to grasp the differences between *requirements* contracts and *IDIQ* contracts, which complicates the single award/multiple award analysis." PFR File, Tab 5 at 28-29 (emphasis in original). She asserts that, although the FAR recognizes IDIQ contracts and requirements contracts, it does not provide for a single-award contract that has characteristics of both. *Id*. She claims that a requirements contract is generally granted to a single contractor and that an IDIQ contract is generally granted in multiple awards but that the "single-award indefinite-delivery, indefinite quantity requirements type contract" desired by the Executive Director is not contemplated by the FAR. *Id*. She

reiterates that she believes such a contract is unlawful and that the Executive Director sought to waive the requirement for legal review of actions up to $25 million. *Id.*

¶20        Although the appellant is correct that the initial decision did not discuss the nuances between the two types of indefinite-delivery contracts—an IDIQ contract and a requirements contract—we nonetheless agree with the administrative judge's conclusion that the appellant failed to prove that she had a reasonable belief in the alleged illegality of the above-described contract. ID at 17-18. The crux of the appellant's challenge to the legality of the contract appears to be that the FAR does not provide for a single-award IDIQ contract, and that a single-award contract is typically a requirements contract. PFR File, Tab 5 at 28-29. However, the FAR provision governing IDIQ contracts makes clear that, although a contracting officer must "give preference to making multiple awards of indefinite-quantity contracts," 48 C.F.R. § 16.504(c)(1)(i), it nonetheless contemplates single-award IDIQ contracts and provides an enumerated list of considerations for determining the number of contracts to be awarded, 48 C.F.R. § 16.504(c)(1)(ii)(A). Additionally, it provides circumstances in which multiple-award IDIQ contracts must not be awarded, indicating that in some circumstances, single-award IDIQ contracts are appropriate. 48 C.F.R. § 16.504(c)(1)(ii)(B). Thus, the plain language of the FAR itself provides for the very type of contract, even if rare, that the appellant asserts is unlawful. Therefore, given this plain language, we ultimately agree with the administrative judge that no reasonable person—particularly one with the appellant's self-described expertise in procurement—would conclude that the type of contract requested by the Executive Director evidenced a violation law, rule, or regulation.

¶21        Turning to the question of whether the appellant had a reasonable belief that the contract illegally lacked proper review, we rely on the plain language of the relevant FAR provision. The appellant asserted that the agency violated FAR 1.602-2, which provides that "[c]ontracting officers shall [r]equest and

consider the advice of specialists in audit, law, engineering, information security, transportation, and other fields, as appropriate." 48 C.F.R. § 1.602-2(c). However, she has not shown that the substance of the contract required the advice of specialists. The plain language of the regulation explains that such request and consideration shall be sought "as appropriate." 48 C.F.R. § 1.602-2(c). Thus, here, it appears that the appellant believed that, under the circumstances, such consideration and advice was appropriate, while the contracting officer apparently did not. Such policy disputes are not covered as protected disclosures. *See Webb v. Department of the Interior*, 122 M.S.P.R. 248, ¶ 8 (2015) (stating that general philosophical or policy disagreements with agency decisions or actions are not protected unless they separately constitute a disclosure of one of the categories of wrongdoing listed in section 2302(b)(8)(A)). As such, we find that the appellant's second disclosure is not protected under 5 U.S.C. § 2302(b)(8).

> *Disclosure 3: The administrative judge correctly found that the appellant failed to prove by preponderant evidence that her disclosure regarding the alleged false information provided to Congress was protected under section 2302(b)(8)(A).*

¶22      In the appellant's third alleged disclosure, she claimed that, on July 1, 2015, she told the Acting Chief Acquisition Officer that the Executive Director and the SAC Director provided false information in response to a Congressional inquiry. W-3 AF, Tab 10 at 14. Specifically, the appellant asserted that, in June 2015, the Executive Director tasked her with preparing the agency's response to a Congressional inquiry that required a list of all positions for which contract employees are used in any phase of the contracting process. *Id*. at 15. Several agency employees determined that they needed to report that OAO employed four contract employees. *Id*. at 43; IAF, Tab 9 at 16. According to the appellant, the Executive Director later told the appellant that she and the SAC Director did not want to report the use of any contract employees, and she removed the appellant from the task. W-3 AF, Tab 10 at 15, 43. On September 11, 2015, the agency generated a memorandum in response to the Congressional inquiry, which stated

that OAO does "not use contractor employees in contract management and oversight roles." IAF, Tab 9 at 28. According to the appellant, when she met with the Acting Chief Acquisition Officer on July 1, 2015, she disclosed that the Executive Director provided false information to Congress. W-3 AF, Tab 10 at 16, 44.

¶23 Below, the administrative judge considered the appellant's version of events as set forth above, and also considered the Executive Director's statements that she did not recall telling the appellant not to provide accurate information about contract employees to Congress, and that, regarding the memorandum submitted to Congress, she had had back surgery that summer and was out on sick leave for 8 weeks, only returning to work on September 16, 2015—5 days after the memorandum was issued. ID at 15; W-3 AF, Tab 16 at 5. The administrative judge also considered the Executive Director's assertion that the memorandum was drafted by someone else and that, although the signature on the memorandum purported to be hers, she did not recognize it. ID at 15; W-3 AF, Tab 16 at 5. Based on the foregoing, he found that the appellant failed to present preponderant evidence that she had a reasonable belief in the disclosure that the Executive Director lied to Congress. ID at 15-16.

¶24 On review, the appellant appears to attempt to reframe the disclosure from claiming, as she did below, that she disclosed that the Executive Director and the SAC Director provided false information to Congress, to claiming that she disclosed that those two officials were "*preparing* to make a false report to Congress." PFR File, Tab 5 at 29 (emphasis added). The record below, however, is clear about the substance of the appellant's allegation. In her final brief, she asserted that she notified the Acting Chief Acquisition Officer that the Executive Director and the SAC Director "provided false information in response to a Congressional inquiry." W-3 AF, Tab 10 at 14. Her narrative details the situation leading up to the issuance of the memorandum, and further alleges that in her July 1, 2015 meeting with the Acting Chief Acquisition Officer, she raised

the Executive Director's "untruthful response to a Congressional inquiry." *Id*. at 17. Additionally, in her narrative statement, she asserted that the "misrepresentation of fact in response to a Congressional inquiry was the event that triggered [her] decision to meet with" the Acting Chief Acquisition Officer. *Id*. at 43. Thus, nowhere below did the appellant claim that she disclosed that the agency officials were *preparing* to lie. Because the appellant's submissions below are identical to those submitted to OSC and there is no documentation concerning any other arguments made before OSC in the record, the appellant has failed to prove that she exhausted this claim before OSC, and, therefore, we cannot consider it here. *See Mason v. Department of Homeland Security*, 116 M.S.P.R. 135, ¶ 8 (2011) (stating that the Board may consider only matters that the appellant first raised and exhausted before OSC).[5]

¶25 With respect to the disclosure as framed in the proceeding below, we agree with the administrative judge that the appellant failed to prove that she had a reasonable belief in the contents of this disclosure. The Executive Director stated that she was out on sick leave during the relevant time period that the memorandum was written and submitted, IAF, Tab 9 at 28; W-3 AF, Tab 16 at 5, and the appellant has not disputed that fact either below or on review, W-3 AF, Tab 10; PFR File, Tab 5. Additionally, although the Board does not claim any expertise in handwriting, it is clear on its face that the signature on the

---

[5] The Board has recently clarified the substantive requirements of exhaustion. *Chambers v. Department of Homeland Security*, 2022 MSPB 8, ¶¶ 10-11. The requirements are met when an appellant has provided OSC with a sufficient basis to pursue an investigation. The Board's jurisdiction is limited to those issues that have been previously raised with OSC. However, an appellant may give a more detailed account of her whistleblowing activities before the Board than she did to OSC. An appellant may demonstrate exhaustion through her initial OSC complaint, evidence that she amended the original complaint, including but not limited to OSC's determination letter and other letters from OSC referencing any amended allegations, and her written responses to OSC referencing the amended allegations. She may also establish exhaustion through other sufficiently reliable evidence, such as an affidavit or a declaration attesting that she raised with OSC the substance of the facts in the Board appeal. *Id.*

memorandum, while purporting to be that of the Executive Director, does not even remotely resemble other signatures of the Executive Director contained in the record, IAF, Tab 9 at 28; W-3 AF, Tab 13 at 44, Tab 16 at 9, Tab 17 at 48, lending support to her assertion that someone else signed the document for her,[6] W-3 AF, Tab 16 at 5. Moreover, the appellant has alleged that she made this disclosure on July 1, 2015, but the memorandum containing the purported false information was not issued until September 11, 2015. IAF, Tab 9 at 28. Based on the foregoing, we agree that the appellant failed to prove by preponderant evidence that she had a reasonable belief in the disclosure that the Executive Director lied to Congress.

The agency's denial of the appellant's promotion, nonselection of the appellant for two positions, 2015 and 2016 performance evaluations, and significant change in duties, responsibilities, and working conditions constitute personnel actions under 5 U.S.C. § 2302(a)(2)(A).

¶26     Because the administrative judge found that the appellant failed to make a protected disclosure, he did not proceed to adjudicate whether any of the disclosures contributed to a personnel action. IAF, Tab 20 at 2-4; ID at 5-7, 23. As explained above, because the record is fully developed and because we have found that the appellant proved that she made a protected disclosure, we fully adjudicate her claims here. *See, e.g.*, *Forte*, 123 M.S.P.R. 124, ¶ 27; *see also Schnell v. Department of the Army*, 114 M.S.P.R. 83, ¶¶ 17-24 (adjudicating the remainder of an appellant's IRA appeal after concluding that the administrative judge erred in finding that the appellant failed to prove that he exhausted his remedy with OSC).

¶27     The appellant has alleged that, in reprisal for her disclosures, the agency took a series of personnel actions against her, including denying her a promotion in 2015, not selecting her for two other positions for which she applied in 2016,

---

[6] Although unclear, it is possible that someone else signed the document and wrote "for" before the Executive Director's name. W-1 AF, Tab 9 at 28.

giving her unjustifiably low performance evaluations in 2015 and 2016, denying a grievance of her 2015 performance evaluation, denying her an opportunity to complete the SESCDP training program, and subjecting her to a hostile work environment. IAF, Tab 1 at 8-11, Tab 20 at 3-4. As explained below, we find that the appellant proved by preponderant evidence that these constitute personnel actions under 5 U.S.C. § 2302(a)(2)(A) except for the 2015 grievance denial and the alleged blocking of her participation in the training program.

> *The appellant's denial of a promotion, nonselection, and performance appraisals are personnel actions under 5 U.S.C. § 2302(a)(2)(A).*

¶28     As an initial matter, it appears undisputed that the agency did not select the appellant for a promotion in 2015 or for details to two positions for which she had applied in or around June of 2016, namely a Deputy Chief of Staff position and an Associate Deputy Assistant Secretary (ADAS) for the Office of Procurement Policy, Systems, and Oversight position.[7] IAF, Tab 9 at 174, 177;[8] W-3 AF,

---

[7] The record in this case is long and convoluted. It appears that the appellant has also alleged that she applied for two other positions in the National Acquisition Center and was not selected for either position. W-3 AF, Tab 10 at 60. It is unclear whether these nonselections were the ones accepted for adjudication below by the administrative judge, or whether the two nonselections were the two details set forth here. However, the appellant has offered no further information regarding these nonselections by the National Acquisition Center, such as the dates she applied, the dates she was not selected, who was responsible for the selections, and so forth. As such, we find these allegations to be too vague to consider here. *See McDonnell v. Department of Agriculture*, 108 M.S.P.R. 443, ¶ 7 (2008) (stating that the Board lacks IRA jurisdiction over conclusory, vague, or unsupported allegations). Because her allegations contain more information regarding the detail positions, we have considered those personnel actions.

[8] Regarding the detail to the ADAS position, there is some record evidence suggesting that ultimately no one was selected for the position. IAF, Tab 9 at 177. Although there may be a question as to whether a nonselection for a position that was ultimately never filled—a situation somewhat comparable to the cancellation of a vacancy announcement—can constitute a personnel action, *see, e.g.*, *Costin v. Department of Health and Human Services*, 64 M.S.P.R. 517, 530 (1994), the record elsewhere suggests that soon after the agency informed the appellant that no one would be detailed to the ADAS position, it did place somebody in that role, IAF, Tab 9 at 179; W-3 AF, Tab 10 at 60.

Tab 10 at 42, 59-60, Tab 15 at 13.  Decisions to not promote or to not appoint an applicant, otherwise known as nonselections, are enumerated personnel actions under 5 U.S.C. § 2302(a)(2)(A)(i)-(ii).  Additionally, the record contains the appellant's 2015 and 2016 performance evaluations, W-3 AF, Tab 17 at 48-56, 61-67, and a performance evaluation is a personnel action under 5 U.S.C. § 2302(a)(2)(A)(viii).[9]

> *The appellant's claim of a hostile work environment qualifies as a personnel action under 5 U.S.C. § 2302(a)(2)(A)(xii) because it involves a significant change in duties, responsibilities, and working conditions.*

¶29      In her claim of a hostile work environment, the appellant generally alleged, among other things, that the Executive Director's attitude towards her substantially deteriorated, that her workload was increased and additional assistance was not provided, that she was excluded from high-visibility, complex projects, that she experienced several issues related to leave, that her relationships and authority with subordinates were weakened by the Executive Director, and that she was forced into uncomfortable situations with a subordinate by the Executive Director.  IAF, Tab 20 at 2-4; W-3 AF, Tab 10 at 42-69.  She also alleged that the Acting Chief Acquisition Officer avoided contact and decreased communications with her.  W-3 AF, Tab 10 at 44.

¶30      A hostile work environment claim can constitute a personnel action under 5 U.S.C. § 2302(a)(2)(A)(xii) when the components of the claim amount to a significant change in duties, responsibilities, or working conditions.  *Skarada v. Department of Veterans Affairs*, 2022 MSPB 17, ¶ 16.  When determining whether an appellant has experienced a "significant change in duties,

---

[9] The appellant's summary rating for her 2015 performance appraisal was "Excellent," and her summary rating for her 2016 performance appraisal was "Fully Successful." W-3 AF, Tab 17 at 53, 65.  Although these are typically favorable, or, at a minimum, acceptable ratings, 5 U.S.C. § 2302(a)(2)(A) does not differentiate between levels of ratings.  Rather, that section simply provides that "a performance evaluation under chapter 43 of this title or under title 38" constitutes a personnel action.  5 U.S.C. § 2302(a)(2)(A)(viii).

responsibilities, or working conditions," the Board must consider the alleged agency actions both collectively and individually because, even if an alleged action does not constitute a covered personnel action individually, the cumulative effect of certain actions could constitute a significant change in duties, responsibilities, and working conditions. *See Holderfield v. Merit Systems Protection Board*, 326 F.3d 1207, 1209-10 (Fed. Cir. 2003). Ultimately, the Board must decide, based on the totality of the circumstances, whether the agency's actions have practical and significant effects on the overall nature and quality of an employee's working conditions, duties, or responsibilities. *Skarada*, 2022 MSPB 17, ¶¶ 16, 18.

¶31    The appellant's specific allegations that her workload substantially increased and she was not allowed to hire anybody to offset that workload relate directly to a change in duties, responsibilities, and working conditions, as contemplated by 5 U.S.C. § 2302(a)(2)(A)(xii). Specifically, the appellant stated that, after she made her disclosures, she was "swamped" with work and became responsible to provide bimonthly Program Management Reviews in which she had to prepare and provide all briefings on all ABS workload, a requirement not imposed on any other office. W-3 AF, Tab 10 at 42. She also asserted that she was required to report monthly on all ABS's completed contracts requiring closeout, even though she had closed out the most and had the fewest requiring closeout of any OAO office. *Id*. Additionally, she claimed that the Executive Director did not allow her to fill vacancies and reduced her total staff by over 68% while assigning additional tasks not relevant to the office's function. *Id*. at 48. Ultimately, the appellant stated, these actions resulted in her working "14 to 24 hours per day, 7 days per week, every week, including holidays." *Id*. at 44.

¶32    The appellant's statements are corroborated, to an extent, by the record. For example, the Executive Director asserted in her sworn statement that "[d]uring 2015, there were changes with regards to delegations, and that impacted the review workload that was going [the appellant's] way." W-3 AF, Tab 16 at 6.

Similarly, the Executive Director acknowledged that the appellant was not able to fill vacancies in her office because of hiring freezes. *Id*. Additionally, the Acting Chief Acquisition Officer confirmed in his sworn statement that the appellant had told him that "she was not getting the staff that she needed and that she was getting too much work," and that she was working more than 8-hour days. *Id*. at 10-11. As such, we find that the appellant proved the substance of her claims regarding her workload. Further, we find that such an increase of workload without additional assistance would have a practical and significant effect on the overall nature and quality of her duties, responsibilities, and working conditions. *See Skarada*, 2022 MSPB 17, ¶ 16. Accordingly, we find that she proved by preponderant evidence that she was subjected to a personnel action under 5 U.S.C. § 2302(a)(2)(A)(xii).

> *The appellant has failed to show by preponderant evidence that the denial of her grievances of her performance appraisals in 2015 and the alleged denial of SESCDP training constitute personnel actions under 5 U.S.C. § 2302(a)(2)(A).*

¶33     The appellant filed two grievances of her 2015 performance appraisals, both of which were denied. IAF, Tab 9 at 114-15, 127. She has asserted that those denials constitute personnel actions. W-3 AF, Tab 10 at 29-30. The denial of a grievance is not an enumerated personnel action under 5 U.S.C. § 2302(a)(2)(A). Although such an action could conceivably relate to a "decision concerning pay, benefits, or awards," as set forth in section 2302(a)(2)(A)(ix), the underlying operative decision concerning pay, benefits, or awards is the performance appraisal itself, and we have already found that to be a personnel action under section 2302(a)(2)(A)(viii). Under the facts of this case, we decline to extend the law to the situation presented here, and, therefore, we find that the 2015 grievance decisions of the 2015 performance appraisal are not covered personnel actions under section 2302(a)(2)(A).

¶34     The appellant has also asserted that the agency denied her the opportunity to complete SESCDP training. Specifically, she asserted that she was accepted into

the SESCDP training program, but that the Executive Director prevented her participation in the program by "overwhelming [her] with tasks, precluding [her] from filling personnel vacancies, and blocking [her] from moving to other positions" so that she was unable to work on the SESCDP requirements. W-3 AF, Tab 10 at 52-53. Under 5 U.S.C. § 2302(a)(2)(A)(ix), a decision concerning training constitutes a personnel action if such training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action set forth in section 2302(a)(2)(A). However, in this case, there is no evidence of any "decision" to deny the appellant the SESCDP training. Moreover, the agency has asserted, and the appellant has not disputed either below or on review, that the appellant ultimately completed the SESCDP training program. W-3 AF, Tab 10 at 68, Tab 15 at 28. As such, we find that the appellant failed to prove by preponderant evidence that the agency made a decision to deny her training and that such a decision constituted a personnel action under 5 U.S.C. § 2302(a)(2)(A).

The appellant proved by preponderant evidence that her protected disclosure was a contributing factor to the agency's decision to give her lower performance appraisals in 2015 and 2016, and to the significant change in duties, responsibilities, and working conditions, but failed to make such a showing with respect to its decision not to promote her in 2015 and not to select her for a detail to either the Deputy Chief of Staff or the ADAS positions in 2016.

¶35    To prove that a disclosure was a contributing factor in a personnel action, the appellant must demonstrate that the fact of, or the content of, the protected disclosure was one of the factors that tended to affect the personnel action in any way. *Mastrullo v. Department of Labor*, 123 M.S.P.R. 110, ¶ 18 (2015). The knowledge/timing test allows an employee to demonstrate that the disclosure was a contributing factor in a personnel action through circumstantial evidence, such as evidence that the official taking the personnel action knew of the disclosure and that the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in

the personnel action. *Id*. Once this test has been met, we must find that the appellant has shown that her whistleblowing was a contributing factor in the personnel action at issue, even if, after a complete analysis of all of the evidence, a reasonable factfinder could not conclude that the appellant's whistleblowing was a contributing factor in the personnel action. *Id*. We address the contributing factor issue separately with respect to each personnel action.

> *The appellant proved that her protected disclosure was a contributing factor to the agency's issuance of her 2015 and 2016 performance appraisals.*

¶36    Regarding the appellant's performance appraisals, the 2015 performance appraisal is dated October 14, 2015, and the 2016 performance appraisal is dated October 20, 2016. W-3 AF, Tab 17 at 53, 65. The appellant asserted below that she made her protected disclosure regarding the unlawful ratification of the UCs in April of 2015. W-3 AF, Tab 10 at 7, 12, 42. A personnel action taken within approximately 1-2 years of the appellant's disclosure satisfies the timing prong of the knowledge/timing test. *Mastrullo*, 123 M.S.P.R. 110, ¶ 21. Because both of the performance appraisals were issued within 18 months of the appellant's April 2015 protected disclosure, we find that she has met the timing prong of the knowledge/timing test. *See id*. Further, the record reflects that the agency official responsible for those appraisals is the Executive Director, W-3 AF, Tab 17 at 48-56, 61-67, and the appellant has sufficiently established that the Executive Director was aware of her April 2015 disclosure, W-3 AF, Tab 16 at 4. Thus, we also find that the appellant has met the knowledge prong of the knowledge/timing test. Because the appellant has met both prongs of the test, we therefore find that she proved by preponderant evidence that her April 2015 protected disclosure was a contributing factor to the 2015 and 2016 performance appraisals. *See Mastrullo*, 123 M.S.P.R. 110, ¶¶ 18, 21.

*The appellant proved that her protected disclosure was a contributing factor to the significant change in duties, responsibilities, and working conditions.*

¶37    Regarding the significant change in duties, responsibilities, and working conditions, the appellant asserted in her sworn statements, and the Executive Director confirmed, that the Executive Director was the agency official responsible for the appellant's workload and the staffing levels of her office. W-3 AF, Tab 10 at 21-23, 48, 53, 58, Tab 16 at 6.  Neither party appears to dispute that the time frame in question for this personnel action runs from April 2015 through the time the Executive Director retired in October of 2016.  W-3 AF, Tab 10 at 21-23, Tab 16 at 6.  We have already stated that the Executive Director was aware of the disclosure because it was made to her, W-3 AF, Tab 16 at 4, and the appellant has sufficiently established that the personnel action occurred within 1-2 years of the April 2015 disclosure, W-3 AF, Tab 10 at 42, 48. As such, she has met the knowledge/timing test and has proven that her protected disclosure was a contributing factor to this personnel action.  *See Mastrullo*, 123 M.S.P.R. 110, ¶¶ 18, 21.

*The appellant failed to prove that her protected disclosure was a contributing factor to the agency's decision to not promote her in 2015.*

¶38    Regarding the agency's decision not to promote the appellant in 2015, the appellant asserted that that decision occurred in April 2015, and the agency has submitted into the record the selection register for the position, dated April 13, 2015, which shows that the appellant was not on the list of best-qualified candidates, and, thus, could not have been selected for the position.  W-3 AF, Tab 10 at 42, Tab 16 at 23.  As such, the operative date for the decision not to promote the appellant is April 13, 2015.  While the appellant asserted generally throughout the appeal that her disclosure occurred in April 2015, her most specific allegation is in her final brief where she states she raised her concern over the ratification of the UCs "as early as late April 2015."  *Id*. at 12.  It is the appellant's burden to show by preponderant evidence that her protected disclosure

was a contributing factor to this personnel action, *see Lu*, 122 M.S.P.R. 335, ¶ 7. We find that she has not provided sufficient evidence to establish that her disclosure occurred <u>before</u> the agency made the decision to not promote her. Accordingly, we find that the appellant failed to prove by preponderant evidence that her protected disclosure was a contributing factor to the agency's decision to not promote her.

*The appellant failed to prove that her protected disclosure was a contributing factor to the agency's decision to not select her for the detail to the ADAS position in 2016.*

¶39    Regarding her claim that the agency did not select her for the detail to the ADAS position in reprisal for her protected disclosure, the appellant asserted that, in May of 2016, she sought the detail to the ADAS position with the Office of Procurement Policy, Systems, and Oversight, where she would be working under the Deputy Assistant Secretary, and that she informed the Executive Director that she was seeking that detail.  W-3 AF, Tab 10 at 59.  She further stated that she later attended a meeting with the Deputy Assistant Secretary, the Executive Director, and the departing ADAS, where she informed the Deputy Assistant Secretary that she wished to be detailed to his office as an ADAS, and that he told her to contact his assistant.  *Id*. at 59-60.  The appellant stated that the Executive Director later told her that the three officials had discussed her potential detail after she had left the meeting, and that she was ultimately informed that no one would be detailed to the position.  *Id*. at 60.

¶40    It appears undisputed that the decision to not select the appellant for the detail to the ADAS position occurred sometime around May 2016, IAF, Tab 9 at 177, which is within 1-2 years of the appellant's April 2015 protected disclosure, which satisfies the timing component of the knowledge/timing test. *Mastrullo*, 123 M.S.P.R. 110, ¶ 21.  Based on the record, the Deputy Assistant Secretary was the agency official responsible for the decision regarding the detail, IAF, Tab 9 at 177; W-3 AF, Tab 10 at 59-60; however, the appellant has not

asserted, much less proven, that he was aware of her protected disclosure. Nonetheless, in addition to proving actual knowledge to meet the knowledge component of the knowledge/timing test, an appellant may also show that the official taking the personnel action had constructive knowledge of the protected disclosure. *Nasuti v. Department of State*, 120 M.S.P.R. 588, ¶ 7 (2014); *Dorney v. Department of the Army*, 117 M.S.P.R. 480, ¶ 11 (2012). An appellant may establish constructive knowledge by demonstrating that an individual with actual knowledge of the disclosure or activity influenced the official accused of taking the retaliatory action. *Nasuti*, 120 M.S.P.R. 588, ¶ 7; *Dorney*, 117 M.S.P.R. 480, ¶ 11.

¶41        Here, the appellant alleged that the Executive Director, who had knowledge of the protected disclosure, W-3 AF, Tab 16 at 4, discussed the appellant's potential detail with the Deputy Assistant Secretary, W-3 AF, Tab 10 at 59-60. The Executive Director acknowledged the discussion, but asserted that she did not approach the Deputy Assistant Secretary, and that he, instead, approached her and offered the unsolicited statement that "he was not interested in [the a]ppellant joining his organization." W-3 AF, Tab 16 at 8. Although it is undisputed that the Executive Director and Deputy Assistant Director discussed the appellant's potential detail, it is the sequence of events that is determinative. The appellant has not challenged the Executive Director's contention that, when the Deputy Assistant Secretary approached the Executive Director, he had already made his decision regarding the appellant's possible detail, and her speculation regarding their conversation is insufficient to establish influence. *See Duncan v. Department of the Air Force*, 115 M.S.P.R. 275, ¶ 9 (2010) (finding that an appellant's speculation did not rise to the level of preponderant evidence), *aff'd*, 674 F.3d 1359 (Fed. Cir. 2012). Therefore, we find that the appellant failed to meet her burden to prove by preponderant evidence that the Executive Director influenced the Deputy Assistant Secretary's decision to not detail the appellant to his office, and has, thus, failed to establish either constructive or actual

knowledge on the part of the Deputy Assistant Secretary. Accordingly, we find that the appellant failed to meet the knowledge prong of the knowledge/timing test.

¶42 When an appellant fails to meet the knowledge/timing test, the Board will consider other evidence, such as evidence pertaining to the strength or weakness of the agency's reasons for taking the personnel action, whether the whistleblowing was personally directed at the proposing or deciding officials, and whether these individuals had a desire or motive to retaliate against the appellant. *See Dorney*, 117 M.S.P.R. 480, ¶ 15.

¶43 Here, there is almost no evidence in the record regarding the strength or weakness of the agency's reasons for not detailing the appellant to this role. Importantly, at this stage of the proceedings, it is the appellant's burden to establish that her protected disclosure was a contributing factor to a personnel action and this lack of evidence cuts against her. Further, her protected disclosure was not personally directed at the Deputy Assistant Secretary, nor did the Deputy Assistant Secretary have any knowledge of it. This lack of knowledge suggests that the Deputy Assistant Secretary could not have given the protected disclosure any weight and that he could not have had any desire or motive to retaliate based thereon. *Cf. Dorney*, 117 M.S.P.R. 480, ¶ 15 (stating that any weight given to a whistleblowing disclosure, either alone or in combination with other factors, can satisfy the contributing factor standard); *cf. Sherman v. Department of Homeland Security*, 122 M.S.P.R. 644, ¶¶ 3-4, 9 (2015) (explaining that a disclosure could have been a contributing factor in a negative performance evaluation only if the reviewing official learned of it before making his decision). Based on the foregoing, we find that the appellant failed to prove that her protected disclosure was a contributing factor to this action.

*The appellant failed to prove that her protected disclosure was a contributing factor to the agency's decision to not select her for the Deputy Chief of Staff position in or around May or June 2016.*

¶44   The appellant asserted that, in or around May or June 2016, she applied for the Deputy Chief of Staff position. W-3 AF, Tab 10 at 59. The record establishes that the Chief of Staff was more likely than not the selecting official for this position. IAF, Tab 9 at 175. The appellant claimed that, after she met with the Chief of Staff, he indicated that he was going to call the Acting Chief Acquisition Officer, but that after his conversation with the Acting Chief Acquisition Officer, the appellant never heard back from the Chief of Staff again. W-3 AF, Tab 10 at 59. We interpret these statements to amount to an allegation that the Acting Chief Acquisition Officer influenced the Chief of Staff's decision not to hire the appellant for the position.

¶45   As explained above, an appellant may establish either actual or constructive knowledge to meet the knowledge portion of the knowledge/timing test, and can show constructive knowledge by demonstrating that an individual with actual knowledge of the disclosure or activity influenced the official accused of taking the retaliatory action. *Nasuti*, 120 M.S.P.R. 588, ¶ 7; *Dorney*, 117 M.S.P.R. 480, ¶ 11. Here, the appellant has established that the Acting Chief Acquisition Officer had actual knowledge of her protected disclosure, W-3 AF, Tab 16 at 10-11, and has alleged that he influenced the Chief of Staff's decision regarding her nonselection, W-3 AF, Tab 10 at 59. However, she has not produced any evidence of such influence, such as when the two officials met, how long they spoke, or what they spoke about, whether the Acting Chief Acquisition Officer was aware that the appellant was seeking the position, or any other corroboration of her claim. It is the appellant's burden of proof to establish that her protected disclosure was a contributing factor to the nonselection. 5 U.S.C. § 1221(e)(1); *Lu*, 122 M.S.P.R. 335, ¶ 7. Her bare assertion, without more, is insufficient to establish constructive knowledge by preponderant evidence, *see*

*Duncan*, 115 M.S.P.R. 275, ¶ 9.  As such, we find that the appellant failed to prove the knowledge prong of the knowledge/timing test.

¶46    As set forth above, when an appellant fails to meet the knowledge/timing test, the Board will generally consider other evidence, such as evidence related to the strength or weakness of the agency's reasons for the personnel action, whether the proposing or deciding official was the subject of the appellant's protected disclosure, and whether those officials had a desire or motive to retaliate against the appellant.  *See Dorney*, 117 M.S.P.R. 480, ¶ 15.  Here, like our above analysis of the ADAS nonselection, although the record lacks evidence regarding why the agency did not select the appellant for this detail, the appellant has not shown that its decision was weak or unsupported.  Further, the appellant's protected disclosure regarding the unlawful ratification of the UCs was not directed at the Chief of Staff, and the appellant failed to prove that he had either actual or constructive knowledge of the disclosure.  Again, such lack of knowledge suggests that the Chief of Staff could not have given the appellant's protected disclosure any weight, nor could he have had any desire or motive to retaliate based thereon.  *Cf. Sherman*, 122 M.S.P.R. 644, ¶¶ 3-4, 9; *Dorney*, 117 M.S.P.R. 480, ¶ 15.  Accordingly, we find that the appellant failed to prove by preponderant evidence that her protected disclosure was a contributing factor to this personnel action.

The agency proved by clear and convincing evidence that it would have given the appellant the same performance rating in 2015 and would have changed her duties, responsibilities, and working conditions even in the absence of her protected disclosure, but failed to prove that it would have given her the same performance rating in 2016 in the absence of her protected disclosure.

¶47    Once the appellant makes a prima facie showing of whistleblower reprisal, the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the same personnel action in the absence of the protected disclosure.  *Lu*, 122 M.S.P.R. 335, ¶ 7.  Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm

belief as to the allegations sought to be established; it is a higher standard than the "preponderance of the evidence" standard. *Sutton v. Department of Justice*, 94 M.S.P.R. 4, ¶ 18 (2003), *aff'd*, 97 F. App'x 322 (Fed. Cir. 2004); 5 C.F.R. § 1209.4(e). In determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, the Board will consider all of the relevant factors, including the following ("*Carr* factors"): (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Soto v. Department of Veterans Aff*airs, 2022 MSPB 6, ¶ 11; *see also Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).[10] The Board does not view these factors as discrete elements, each of which the agency must prove by clear and convincing evidence, but rather weighs these factors together to determine whether the evidence is clear and convincing as a whole. *Lu*, 122 M.S.P.R. 335, ¶ 7. The Board must consider all the evidence, including evidence that fairly detracts from the conclusion that the agency met its burden. *Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012). Again, because the record is fully developed in this matter, we consider these questions here without remand. *See Forte*, 123 M.S.P.R. 124, ¶ 27.

---

[10] Historically, the Board has been bound by the precedent of the U.S. Court of Appeals for the Federal Circuit on these types of whistleblower issues. However, pursuant to the All Circuit Review Act, Pub. L. No. 115-195, 132 Stat. 1510 (2018), appellants may file petitions for judicial review of Board decisions in whistleblower reprisal cases with any circuit court of appeals of competent jurisdiction. *See* 5 U.S.C. § 7703(b)(1)(B). Therefore, we must consider these issues with the view that the appellant may seek review of this decision before any appropriate court of appeal.

*The agency proved by clear and convincing evidence that it would have given the appellant the same performance appraisal rating in 2015 even in the absence of her protected disclosure but failed to prove the same with respect to her 2016 performance appraisal rating.*

¶48    Regarding the 2015 and 2016 performance appraisals, we first look to the strength of the agency's evidence in issuing the ratings. *See Carr*, 185 F.3d at 1323. With respect to the appellant's 2015 performance appraisal, the Executive Director rated the appellant "Excellent." W-3 AF, Tab 17 at 53. Although this is the second-highest possible rating, the appellant asserted that the evaluation "provided objectively inaccurate numbers and statements regarding [her] performance, omitted most of [her] accomplishments during the rating period, omitted [her] most significant accomplishments, and understated the accomplishments that [the Executive Director] referenced." W-3 AF, Tab 10 at 50. In a sworn statement, the Executive Director asserted that she does "not view an Excellent as a low rating." W-3 AF, Tab 16 at 8. The performance appraisal itself shows that the Executive Director gave the appellant the highest rating ("Exceptional") in six of the seven rating categories and the middle rating level ("Fully Successful") in the remaining seventh category, which was "Teamwork and Cooperation."[11]    W-3 AF, Tab 17 at 52. The narrative accompanying the performance evaluation sets forth the basis for the rating in each category, explained the appellant's accomplishments in a brief, yet thorough, manner, and acknowledged that her most significant contribution during the rating period was the mobilization of her workforce to address a backlog of more than 6,000 contract closeouts. *Id*. at 55-56. The appellant's challenges to this narrative are vague and unspecific, and do not undercut in any meaningful way the narrative's evidentiary value.[12] W-3 AF, Tab 10 at 50.

---

[11] To receive an overall performance rating of "Outstanding," an agency employee must achieve an "Exceptional" rating for all elements. W-3 AF, Tab 17 at 53.

[12] The appellant's only discernable specific challenge to her performance appraisal relates to the "Teamwork and Cooperation" element, wherein she argues that the agency

¶49    With respect to the 2016 performance evaluation, the Executive Director rated the appellant "Fully Successful." W-3 AF, Tab 17 at 65. This rating has two rating categories above it and two below it. *Id*. The appellant has not explained in her pleadings below or in a sworn statement why she was dissatisfied with this rating, and the Executive Director stated in her sworn statement that she does not consider "Fully Successful" to be a low rating. W-3 AF, Tab 16 at 8. The appraisal shows that the appellant received "Fully Successful" ratings for five out of the six rated elements, and an "Exceptional" rating for the sixth element. W-3 AF, Tab 17 at 64. Unlike the appellant's 2015 performance appraisal, however, the narrative summary of the appellant's performance for 2016 is limited to one brief paragraph discussing only one of the critical elements. *Id*. at 67.

¶50    Based on the foregoing, we find that the agency presented strong and convincing evidence to support the 2015 performance appraisal rating, but we also find that it presented almost no substantive evidence to support the 2016 performance appraisal rating. Thus, this factor weighs in favor of the agency with respect to the 2015 performance appraisal but against it with respect to the 2016 performance appraisal.

¶51    Regarding the existence and strength of the agency's motive to retaliate, the Executive Director stated in her affidavit that she did not rate the appellant "Excellent" in 2015 or "Fully Successful" in 2016 "as retaliation for or as any relation to any disclosure made to or about me." W-3 AF, Tab 16 at 8. However, the Executive Director was the agency official responsible for both appraisals, and the Board has found that when the deciding official for the personnel action is the subject of an appellant's disclosure, as is undisputedly the case here, that official may have a motive to retaliate against her. *See Mithen v. Department of*

did not correctly assess her travel, W-3 AF, Tab 10 at 50, but that challenge appears to relate more directly to the Executive Director's response to the appellant's grievance of the appraisal, as opposed to the appraisal narrative itself, *id*. at 59.

*Veterans Affairs*, [119 M.S.P.R. 215](#), ¶ 9 (2013). Further, we have found that those responsible for the agency's performance overall may well be motivated to retaliate even if they are not directly implicated by the disclosures, as the criticism reflects on them in their capacities as managers and employees. *Wilson v. Department of Veterans Affairs*, [2022 MSPB 7](#), ¶ 65; *Smith v. Department of the Army*, [2022 MSPB 4](#), ¶¶ 28-29. The record establishes that the Executive Director was in a senior leadership role in the work unit and was presumably responsible for its overall performance, and, thus, may well have been motivated to retaliate against the appellant because the criticism included in the disclosure reflects on her in her capacity as a manager. *See id*. Moreover, the record also reflects that the relationship between the Executive Director and the appellant was tense and strained. Thus, despite the Executive Director's statement that the appraisals were not in retaliation, we nonetheless find that this factor favors the appellant.

¶52        The third *Carr* factor involves comparing employees who are similarly and not identically situated. *Soto*, [2022 MSPB 6](#), ¶ 11; *see also Whitmore*, 680 F.3d at 1373. In this case, the appellant has admitted that at least 45% of agency employees do not get "Outstanding" ratings. W-3 AF, Tab 10 at 51. The agency has not presented any other evidence on this point, W-3 AF, Tabs 16-18, but it does not dispute the appellant's contention. Because it is the agency's burden of proof, when the agency fails to introduce relevant comparator evidence, the third *Carr* factor is effectively removed from consideration, although it cannot weigh in favor of the agency. *Soto*, [2022 MSPB 6](#), ¶ 18; *see also Rickel v. Department of the Navy*, [31 F.4th 1358](#), 1365-66 (Fed. Cir. 2022) ("The lack of evidence on the third *Carr* factor appears neutral[.]") (internal citation omitted). Considering the appellant's own admission with the agency's lack of other substantive evidence, we find that this factor weighs mostly neutral, if not slightly in favor of the agency. *See Siler v. Environmental Protection Agency*, [908 F.3d 1291](#), 1299

(Fed. Cir. 2018) (holding that in the absence of relevant comparator evidence, the third *Carr* factor cannot favor the agency).

¶53    Weighing these factors against one another and on the whole with respect to the 2015 performance appraisal, we find that the first factor warrants significant weight, particularly given the detailed narrative provided for that year's performance appraisal.  Moreover, by the appellant's own admission, nearly half of agency employees receive ratings lower than "Outstanding," and it is unrealistic to assume that those half are all whistleblowers, suggesting that other similarly situated employees who are not whistleblowers also received ratings below "Outstanding."  Although the Executive Director may have had a motive to retaliate, we nonetheless find that the agency met its burden to show by clear and convincing evidence that the appellant would have received the same rating in her 2015 performance appraisal even in the absence of her disclosure.

¶54    However, the agency's near-complete lack of evidence to support the appellant's 2016 performance appraisal is concerning.  Additionally, the fact that the agency rated the appellant at a higher level just the year prior forecloses any hypothetical justification that the appellant's 2016 rating was consistent with prior ratings.  Indeed, the appellant dropped a performance level in nearly every element from 2015 to 2016.  W-3 AF, Tab 17 at 52, 64.  The Board has held that, when an agency fails to provide any narrative evidence to support a performance rating and there is no reason to believe that the performance rating is consistent with other ratings, the agency fails to meet its burden to show by clear and convincing evidence that it would have given an appellant the same performance rating even in the absence of a protected disclosure.  *See Rumsey v. Department of Justice*, 120 M.S.P.R. 259, ¶¶ 35-38 (2013).  This, combined with the Executive Director's potential motive to retaliate against the appellant, leads us to find that the agency failed to prove by clear and convincing evidence that it would have given the appellant the same performance rating in 2016 even in the absence of her protected disclosure.

*The agency proved by clear and convincing evidence that it would have made significant changes to the appellant's duties, responsibilities, and working conditions even in the absence of her disclosure.*

¶55    As explained above, the gravamen of the appellant's hostile work environment claim under 5 U.S.C. § 2302(a)(2)(A)(xii) relates to her workload and staffing levels.[13]  Regarding the strength of the agency's evidence in support of these changes, the Executive Director stated in her affidavit that, in 2015, "there were changes with regards to delegations, and that impacted the review workload that was going [the appellant's] way."  W-3 AF, Tab 16 at 6.  She also claimed that she intended to allow the appellant to fill vacancies in her office, but that there was a hiring freeze around that time imposed by the Supply Fund Board.  *Id.*  The appellant has not disputed these points.  W-3 AF, Tab 10.  The Executive Director further stated that when people are leaving the agency without those positions being filled and there is still work coming in, it can seem like the workload is increasing.  W-3 AF, Tab 16 at 6.  However, the agency has not addressed the specific tasks identified by the appellant, such as her claim that she was required to provide bimonthly Program Management Reviews in which she had to prepare and provide all briefings on all of the ABS workload and to report monthly on all of ABS's completed contracts requiring closeout.  W-3 AF, Tab 10 at 42.  Furthermore, the appellant asserted that no other office was subject to these requirements.  *Id.*  Although the record does not establish who imposed the above-referenced delegation changes (which could have been responsible for the additional assignments to the appellant's workload), and for what purposes he or she imposed them, the Executive Director nonetheless stated that she "moved work away from [the appellant's] organization to places that had more capacity"

---

[13] We reiterate that, although we have considered the appellant's additional allegations concerning the difficulties she faced in the workplace, such as her allegations that the Executive Director discouraged her from taking leave and withdrew her prior support for the restoration of the appellant's leave, those allegations are too vague to be considered here.  *See supra* ¶ 32 n.10.

and "provided several people from other parts of OAO on details at various times to help with workload." W-3 AF, Tab 16 at 6. The appellant does not appear to dispute this assertion. W-3 AF, Tab 10. We find these explanations convincing and conclude that this factor favors the agency.

¶56 Regarding the second factor, as noted above, it is undisputed that the Executive Director was responsible for the appellant's workload and staffing level. W-3 AF, Tab 10 at 21-23, 48, 53, 58, Tab 16 at 6. In her affidavit, she stated she "did not increase [the appellant's] workload" or "prevent [her] from hiring additional personnel" as retaliation or for any reason relating to [her] disclosures she made to or about me." W-3 AF, Tab 16 at 6-7. Again, however, we incorporate our analysis of this factor from above, namely, that the Executive Director was the subject of the appellant's disclosure and held a leadership role in the work unit and was presumably responsible for its performance overall, and as such, could have had a motive to retaliate against the appellant. *See Wilson*, 2022 MSPB 7, ¶ 65; *see also Whitmore*, 680 F.3d at 1370. As we have found above, this factor favors the appellant.

¶57 Regarding the third *Carr* factor, the agency has not presented any evidence showing that it treats similarly situated employees who are not whistleblowers the same as the appellant in this regard. Whether the agency's lack of evidence here is due to the fact that there are not any employees similarly situated to the appellant, given her leadership role, or because it failed to conduct a search in the first instance is not answered by the record. As previously explained, when the agency fails to introduce relevant comparator evidence, the third *Carr* factor is effectively removed from consideration, although it cannot weigh in favor of the agency. *Soto*, 2022 MSPB 6, ¶ 18.

¶58 Weighing the three *Carr* factors as they relate to the significant change in duties, responsibilities, and working conditions, we place significant weight on the Executive Director's explanation that delegations changed in 2015 and that there was a hiring freeze. Although we acknowledge that the Executive Director

could have had a motive to retaliate, and the agency failed to produce any evidence with regard to the third *Carr* factor, we nonetheless accept the agency's explanation for these actions and its assertion that it did move work away from the appellant when possible. As such, we find that the agency proved by clear and convincing evidence that it would have increased the appellant's workload and disallowed her from filling vacancies even in the absence of her disclosure.

¶59    In conclusion, we reverse the initial decision to find that the appellant established a prima facie case of whistleblower reprisal, and we further find that the agency failed to prove by clear and convincing evidence that it would have given the appellant the same performance rating in 2016 even in the absence of her protected disclosure. Accordingly, for the foregoing reasons, we find that the appellant is entitled to corrective action under 5 U.S.C. § 1221(g)(1) with respect to her 2016 performance appraisal.

**ORDER**

¶60    We ORDER the agency to change the appellant's 2016 performance appraisal such that her rating in each element and the overall rating are the same as the ratings she earned in 2015, ratings that were not tainted by reprisal for whistleblowing.[14]    *Brewer v. Department of the Interior*, 76 M.S.P.R. 363, 372

---

[14] We recognize that some of the elements and metrics in the appellant's performance standards appear to have changed between 2015 and 2016. W-3 AF, Tab 17 at 48-52, 61-64. However, at least five elements are substantially similar. *Id.* Where the appellant's ratings in 2015 and 2016 differ in those five elements, the 2016 rating shall be changed to match the 2015 rating, which was not tainted by reprisal for whistleblowing. Specifically, the appellant's 2016 ratings in the "Pre-Award Function," "Contract Management," and "Human Resources" elements shall be raised to "Exceptional." The appellant's 2015 and 2016 ratings in the "Customer Care and Service" and "Teamwork and Cooperation" elements are the same, and thus do not require a change. *Id.* at 52, 64. Additionally, the appellant's 2016 appraisal included "Employee Engagement" as an element, which was not included in her 2015 appraisal. *Id.* at 52, 64, 66. Thus, we cannot compare her rating in that element to one that was not tainted by reprisal. Because the "Fully Successful" rating given by the agency in the "Employee Engagement" element was the product of reprisal, the agency shall change the appellant's rating in that element to "Exceptional."

(1997); *see* 5 U.S.C. § 1221(e)(1). We also ORDER the agency to provide the appellant with any other relief associated with the higher ratings, including awards and bonuses, such that she is placed as nearly as possible in the situation she would have been in had the agency not retaliated against her. 5 U.S.C. § 1221(g)(1)(A)(i); *see Rumsey*, 120 M.S.P.R. 259, ¶ 50. The agency must complete this action no later than 20 days after the date of this decision.

¶61  We also ORDER the agency to pay the appellant, if applicable, the amount of back pay, interest on back pay, and other benefits under the Office of Personnel Management's regulations, no later than 60 calendar days after the date of this decision. We ORDER the appellant to cooperate in good faith in the agency's efforts to calculate the amount of back pay, interest, and benefits due, and to provide all necessary information the agency requests to help it carry out the Board's Order. If there is a dispute about the amount of back pay, interest due, and/or other benefits, we ORDER the agency to pay the appellant the undisputed amount no later than 60 days after the date of this decision.

¶62  We further ORDER the agency to tell the appellant promptly in writing when it believes it has fully carried out the Board's Order and to describe the actions it took to carry out the Board's Order. The appellant, if not notified, should ask the agency about its progress. *See* 5 C.F.R. § 1201.181(b).

¶63  No later than 30 days after the agency tells the appellant that it has fully carried out the Board's Order, the appellant may file a petition for enforcement with the office that issued the initial decision in this appeal if the appellant believes that the agency did not fully carry out the Board's Order. The petition should contain the specific reasons why the appellant believes that the agency has not fully carried out the Board's Order, and should include the dates and results of any communication with the agency. 5 C.F.R. § 1201.182(a).

¶64  For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation

necessary to process payments and adjustments resulting from a Board decision are attached. The agency is ORDERED to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

¶65 This is the final decision of the Merit Systems Protection Board in this appeal. Title 5 of the Code of Federal Regulations, section 1201.113 (5 C.F.R. § 1201.113).

### NOTICE TO THE APPELLANT
### REGARDING YOUR RIGHT TO REQUEST
### ATTORNEY FEES AND COSTS

You may be entitled to be paid by the agency for your reasonable attorney fees and costs. To be paid, you must meet the requirements set forth at title 5 of the United States Code (5 U.S.C.), sections 7701(g), 1221(g), or 1214(g). The regulations may be found at 5 C.F.R. §§ 1201.201, 1202.202, and 1201.203. If you believe you meet these requirements, you must file a motion for attorney fees and costs WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION. You must file your motion for attorney fees and costs with the office that issued the initial decision on your appeal.

### NOTICE TO THE APPELLANT REGARDING
### YOUR RIGHT TO REQUEST CONSEQUENTIAL AND/OR
### COMPENSATORY DAMAGES

You may be entitled to be paid by the agency for your consequential damages, including medical costs incurred, travel expenses, and any other reasonable and foreseeable consequential damages. To be paid, you must meet the requirements set out at 5 U.S.C. §§ 1214(g) or 1221(g). The regulations may be found at 5 C.F.R. §§ 1201.201, 1201.202 and 1201.204.

In addition, the Whistleblower Protection Enhancement Act of 2012 authorized the award of compensatory damages including interest, reasonable

expert witness fees, and costs, 5 U.S.C. §§ 1214(g)(2), 1221(g)(1)(A)(ii), which you may be entitled to receive.

If you believe you are entitled to these damages, you must file a motion for consequential damages and/or compensatory damages WITHIN 60 CALENDAR DAYS OF THE DATE OF THIS DECISION. You must file your motion with the office that issued the initial decision on your appeal.

## NOTICE TO THE PARTIES

A copy of the decision will be referred to the Special Counsel "to investigate and take appropriate action under [5 U.S.C.] section 1215," based on the determination that "there is reason to believe that a current employee may have committed a prohibited personnel practice" under 5 U.S.C. § 2302(b)(8) or section 2302(b)(9)(A)(i), (B), (C), or (D). 5 U.S.C. § 1221(f)(3). Please note that while any Special Counsel investigation related to this decision is pending, "no disciplinary action shall be taken against any employee for any alleged prohibited activity under investigation or for any related activity without the approval of the Special Counsel." 5 U.S.C. § 1214(f).

## NOTICE OF APPEAL RIGHTS[15]

You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should

---

[15] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) <u>Judicial review in general</u>**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) <u>Judicial or EEOC review of cases involving a claim of discrimination</u>**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after you receive</u> this decision.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017).  If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** <u>after your representative receives</u> this decision.  If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after you receive</u> this decision.  5 U.S.C. § 7702(b)(1).  If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** <u>after your representative receives</u> this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[16]  The court of appeals must receive your petition for review within **60 days** of the date of issuance of this decision.  5 U.S.C. § 7703(b)(1)(B).

---

[16] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction.  The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.



FOR THE BOARD:                          /s/ for
                                    _____
                                    Jennifer Everling
                                    Acting Clerk of the Board

Washington, D.C.



**DEFENSE FINANCE AND ACCOUNTING SERVICE**
**Civilian Pay Operations**

# DFAS BACK PAY CHECKLIST

The following documentation is required by DFAS Civilian Pay to compute and pay back pay pursuant to 5 CFR § 550.805.  Human resources/local payroll offices should use the following checklist to ensure a request for payment of back pay is complete.  Missing documentation may substantially delay the processing of a back pay award.  **More information may be found at: https://wss.apan.org/public/DFASPayroll/Back%20Pay%20Process/Forms/AllItems.aspx.**

**NOTE:  Attorneys' fees or other non-wage payments (such as damages) are paid by vendor pay, not DFAS Civilian Pay.**

☐  1) Submit a **"SETTLEMENT INQUIRY - Submission"** Remedy Ticket.  Please identify the specific dates of the back pay period within the ticket comments.

Attach the following documentation to the Remedy Ticket, or provide a statement in the ticket comments as to why the documentation is not applicable:

☐  2) Settlement agreement, administrative determination, arbitrator award, or order.

☐  3) Signed and completed "Employee Statement Relative to Back Pay".

☐  4) All required SF50s (new, corrected, or canceled).  **\*\*\*Do not process online SF50s until notified to do so by DFAS Civilian Pay.\*\*\***

☐  5) Certified timecards/corrected timecards.  **\*\*\*Do not process online timecards until notified to do so by DFAS Civilian Pay.\*\*\***

☐  6) All relevant benefit election forms (e.g. TSP, FEHB, etc.).

☐  7) Outside earnings documentation.  Include record of all amounts earned by the employee in a job undertaken during the back pay period to replace federal employment.  Documentation includes W-2 or 1099 statements, payroll documents/records, etc.  Also, include record of any unemployment earning statements, workers' compensation, CSRS/FERS retirement annuity payments, refunds of CSRS/FERS employee premiums, or severance pay received by the employee upon separation.

**Lump Sum Leave Payment Debts:**  When a separation is later reversed, there is no authority under 5 U.S.C. § 5551 for the reinstated employee to keep the lump sum annual leave payment they may have received.  The payroll office must collect the debt from the back pay award.  The annual leave will be restored to the employee.  Annual leave that exceeds the annual leave ceiling will be restored to a separate leave account pursuant to 5 CFR § 550.805(g).



## NATIONAL FINANCE CENTER CHECKLIST FOR BACK PAY CASES

Below is the information/documentation required by National Finance Center to process payments/adjustments agreed on in Back Pay Cases (settlements, restorations) or as ordered by the Merit Systems Protection Board, EEOC, and courts**.**

1. Initiate and submit AD-343 (Payroll/Action Request) with clear and concise information describing what to do in accordance with decision.

2. The following information must be included on AD-343 for Restoration:

   a. Employee name and social security number.
   b. Detailed explanation of request.
   c. Valid agency accounting.
   d. Authorized signature (Table 63).
   e. If interest is to be included.
   f. Check mailing address.
   g. Indicate if case is prior to conversion.  Computations must be attached.
   h. Indicate the amount of Severance and Lump Sum Annual Leave Payment to be collected (if applicable).

Attachments to AD-343

1. Provide pay entitlement to include Overtime, Night Differential, Shift Premium, Sunday Premium, etc. with number of hours and dates for each entitlement (if applicable).
2. Copies of SF-50s (Personnel Actions) or list of salary adjustments/changes and amounts.
3. Outside earnings documentation statement from agency.
4. If employee received retirement annuity or unemployment, provide amount and address to return monies.
5. Provide forms for FEGLI, FEHBA, or TSP deductions. (if applicable)
6. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.
7. If employee retires at end of Restoration Period, provide hours of Lump Sum Annual Leave to be paid.

NOTE:  If prior to conversion, agency must attach Computation Worksheet by Pay Period and required data in 1-7 above.

The following information must be included on AD-343 for Settlement Cases:  (Lump Sum Payment, Correction to Promotion, Wage Grade Increase, FLSA, etc.)

   a. Must provide same data as in 2, a-g above.
   b. Prior to conversion computation must be provided.
   c. Lump Sum amount of Settlement, and if taxable or non-taxable.

If you have any questions or require clarification on the above, please contact NFC's Payroll/Personnel Operations at 504-255-4630.